## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**GARY NORTHINGTON,**

       **Plaintiff,**                                   **Case No. 16-cv-12931**

       **v.**                                            **District Judge Paul D. Borman**

**DR. BADAWI M. ABDELLATIF, et al.**                **Magistrate Judge Mona K. Majzoub**

       **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff Gary Northington filed this *pro se* civil rights matter against various prison medical providers and employees of the Michigan Department of Corrections ("MDOC"). (Docket no. 13.)  Plaintiff alleges that Defendants violated the Eighth Amendment by denying requested medical care with deliberate indifference to his serious medical needs and seeks damages pursuant to 42 U.S.C. § 1983.  (*Id.*)

Defendants Badawi Abdellatif, M.D., Patrick Geml, P.A., Rasheed Bashir, M.D., (the "Corizon Defendants") moved for summary judgment .  (Docket no. 153.)  Defendants Lisa Adray, Dr. Jeffrey Steive, Eutrilla Taylor, Heidi Washington, Daniel Heyns, and Dr. Gary Kirstein (the "MDOC Defendants") also filed a motion for summary judgment.  (Docket no. 173.)  Plaintiff filed a response opposing the Corizon Defendants' motion (docket no. 200) and to the MDOC Defendants' motion (docket no. 218).

This action has been referred to the undersigned for all pretrial proceedings, including a hearing and determination of all non-dispositive matters pursuant to 28 U.S.C. § 636(b)(1)(A) and/or a report and recommendation on all dispositive matters pursuant to 28 U.S.C.

§ 636(b)(1)(B).  (Docket no. 19.)  The Court has reviewed the pleadings and dispenses with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

## I.    RECOMMENDATION

The undersigned recommends that Defendants' motions for summary judgment (docket no. 153; docket no. 173) be **GRANTED**, and that Plaintiff's claims be dismissed.

## II.   REPORT

### A.    Background

This is a civil rights action brought *pro se* under 42 U.S.C. § 1983 by Plaintiff Gary Northington, a prisoner in the custody of the MDOC.  (Docket no. 1; docket no. 13.)  Defendants are employees of the MDOC or of Corizon Health, Inc.  (*Id.*)  Citing several alleged incidents occurring between 2007 and 2016, Plaintiff contends that Defendants denied requested medical care with deliberate indifference to his serious medical needs.  (*Id.*)

Plaintiff asserts that, while he was in custody at Macomb Correctional Facility ("MRF"), Defendants (1) refused to perform diagnostic tests to determine the cause of chest pains and apparent allergic reactions and (2) "falsified" Plaintiff's medical records by failing to report symptoms to avoid paying for treatment.  (*Id.*)

On November 3, 2012, Plaintiff reported to the healthcare facility at MRF complaining of a cough.  (Docket no. 155, p. 7.)  Nurse Kassandra Davidson consulted Defendant Geml, who prescribed a nebulizer treatment.  (*Id.* at 8.)  Three days later, Plaintiff saw defendant Geml with similar respiratory complaints.  (*Id.* at 12–18.)  Defendant Geml ordered an x-ray of Plaintiff's chest and prescribed doxycycline and additional nebulizer treatments.  (*Id.*)  The x-ray showed "chronic changes represented by flattening of the hemidiaphragms, an increase of the retrosternal clear space and mild apical pleural thickening" as well as "several old granuloma[s] that are seen

of both perihilar regions as well as the right lower lobe." (*Id.* at 20.) The reviewer diagnosed Plaintiff with "mild COPD" with "no active infiltrates." (*Id.*)

On December 4, 2012, Plaintiff saw Defendant Abdellatif for cardiovascular and respiratory issues. (*Id.* at 23–26.) Plaintiff complained of "buzzing/noise in ears, chest pain, headache, nausea and vomiting, SOB [i.e., shortness of breath], tiredness[,] visual disturbances . . . dyspnea with moderate exercise, nocturnal asthma symptoms, nocturnal awakenings with cough, nocturnal awakenings with dyspnea, post-nasal drip and productive cough." (*Id.* at 23.) Plaintiff was taking Norvasc for hypertension and used an inhaler for asthma symptoms. (*Id.*) Defendant Abdellatif concluded that Plaintiff's hypertension was "well controlled" but found it difficult to assess Plaintiff's respiratory issues "due to [Plaintiff] answering yes to almost all questions [regarding symptoms]" and possibly overlapping symptoms of asthma and rhinitis. (*Id*. at 25.) He ordered blood tests and continued Plaintiff's medications. (*Id.*)

In January of 2013, Plaintiff requested replacement inhalers to treat his asthma. (*Id.* at 34.) On February 15, 2013, Defendant Geml renewed the inhaler prescription. (*Id.* 35.)

On March 5, 2013, Plaintiff saw Defendant Abdellatif with cardiovascular and respiratory symptoms. (*Id.* at 37–40.) Plaintiff reported chest pain and shortness of breath, but ultimately Defendant Abdellatif recorded that Plaintiff's hypertension was "well controlled," that his "respiratory effort [was] normal," that "his peak flows are excellent" and that "his lung exam is excellent too." (*Id.* at 39.)

On June 5, 2013, Plaintiff saw Defendant Abdellatif for a regularly scheduled examination. (*Id.* at 42–45.) Defendant Abdellatif recorded that Plaintiff's hypertension and asthma were both well controlled and decreased Plaintiff's prescription to Norvasc (for hypertension). (*Id.* at 44.) Two weeks later, Plaintiff reported to healthcare with chest tightness

and difficulty breathing. (*Id*. at 48–49.) Nurse Meghann Gonzales recorded that Plaintiff exhibited wheezing and labored breathing. (*Id*. at 49.) After consulting Defendant Abdellatif, Nurse Gonzales treated Plaintiff with oxygen and albuterol. (*Id*.) Following the breathing treatment, Plaintiff's "[b]reathing [was] even and unlabored" and Plaintiff stated that he was "fine now." (*Id*.)

On June 26, 2013, Plaintiff reported to healthcare with complaints of heat-related dizziness. (*Id*. at 50–51.) On June 28, Defendant Geml updated Plaintiff's list of accommodations to note that he was "[a]t risk of heat-related illness." (*Id*. at 54.)

On July 1, 2013, Plaintiff reported that he was allergic to wheat and skin lotions used by other inmates. (*Id*. at 56.) Nurse Diana Herring contacted Defendant Geml, who ordered an albuterol updraft treatment. (*Id*.) Nurse Herring observed wheezing in Plaintiff's upper lobes but clear sounds in the lower lobes. (*Id.*)

On July 8, July 15, and July 18, 2013, Plaintiff reported to healthcare with swelling in his feet. (*Id.* at 58–61.) The records of these encounters do not indicate that the Corizon Defendants were notified. (*See id.*) On July 22, 2013, Plaintiff saw Defendant Geml regarding the swelling. (*Id.* at 64–66.) Defendant Geml observed mild edema in Plaintiff's lower legs and changed Plaintiff's hypertension medication from Norvasc to Lasix. (*Id.*) Defendant Abdellatif noted this change and directed prison medical staff to "check [Plaintiff's] BP twice a week [for two] weeks [and] then review." (*Id.* at 69.)

On August 2, 2013, Plaintiff reported to healthcare with symptoms of an infection in his left leg. (*Id.* at 71–75.) Defendant Geml observed that Plaintiff's left foot was "mildly edematous with + calor, rubor, dolar [and] faint redness extending 3/4 up anterior lower leg" and prescribed Bactrim (an antibiotic) and daily nurse checks for three days. (*Id.*) On August 3,

Nurse Sandra Tyler recorded that Plaintiff's leg was "improving" and "less red in color."  (*Id.* at 76.)  However, on August 7, Nurse Diana Herring observed that the infection had worsened.  (*Id.* at 78.)  Defendant Geml was contacted and directed Nurse Herring to send Plaintiff to the local emergency room.  (*Id.*)  Plaintiff was treated at Henry Ford Macomb Hospital and then transferred to Duane Walters Health Center ("DWH") in Jackson, Michigan.  (*Id.* at 79.)  The medical providers at Henry Ford observed that the infection was caused by "poor care of toenails."  (Docket no. 182, p. 79.)

Over the course of a several-week stay at DWH, prison medical staff treated Plaintiff's leg infection and investigated a number of other symptoms reported by Plaintiff.  (Docket no. 155, pp. 81–95.)  On August 8, Nurse Renee Hendrick administered Vancomycin to treat the leg infection and noted that Plaintiff's asthma was under "good control."  (*Id.* at 82.)  On September 5, Nurse Mollie Klee reported that Plaintiff complained that the infection was spreading up his leg and into his chest, neck, left arm and ear.  (Docket no. 182, p. 91.)  However, Nurse Klee did not observe redness, swelling, or warmth in Plaintiff's arm, thorax, chest, neck, or ear.  (*Id.*)  On September 10, Defendant Bashir examined Plaintiff and observed that swelling in Plaintiff's leg had reoccurred, but "redness ha[d] decreased."  (Docket no. 155, p. 84.)  Plaintiff had been taken off antibiotics for the previous ten days, but Defendant Bashir decided to restart a prescription for Bactrim.  (*Id.* at 85.)  On September 19, upon discharge from DWH, Nurse Hendrick recorded that Plaintiff "remain[ed] able to perform ADLs independently."  (*Id.* at 88.)  His primary complaint was "not receiving a formal gluten free diet," but Nurse Hendrick noted that Plaintiff did not meet the criteria for a gluten free diet because he had a "neg[ative] celiac panel."  (*Id.*)  She observed that his leg infection was "stable and improved."  (*Id.*)

5

On September 22, 2013, Plaintiff saw Defendant Abdellatif, who continued Plaintiff's Bactrim prescription for lingering symptoms of his leg infection. (*Id.* at 101–03.) On September 27, 2013, Plaintiff wrote to prison officials to request the opportunity to purchase an allergy test kit from Walmart. (*Id.* at 108.) Plaintiff's request was denied, and there is no indication that it was reviewed by Defendant Abdellatif. (*Id.* at 110.) On October 21, 2013, Defendant Abdellatif noted that Plaintiff's leg showed "less redness and swelling than before" with "no evidence of new cellulitis or infection." (*Id.* at 122.)

On November 21, 2013, Plaintiff had a regularly scheduled "chronic care" examination with P.A. Raul Tumada. (*Id.* at 125–27.) Plaintiff complained of respiratory issues triggered by aerosols, strong odors, exercise, dust, food, seasonal change and tobacco smoke. (*Id.*) P.A. Tumada noted that Plaintiff's asthma and hypertension were poorly controlled. (*Id.*) He prescribed Claritin for allergies and hydrochlorothiazide for hypertension. (*Id.*) On January 14, 2014, Plaintiff saw Defendant Abdellatif with similar complaints as well as reports of buzzing in his ears, irregular heartbeat, and shortness of breath. (*Id.* at 133–36.) Defendant Abdellatif recorded that Plaintiff "has thousands of symptoms [such] that it is difficult to know what is true and important from the minor/unrealistic symptoms." (*Id.*) Abdellatif recorded that Plaintiff had a normal heart rate and rhythm, and his respiratory effort was normal. (*Id.*) He prescribed a new medication, terazosin, for Plaintiff's hypertension. (*Id.*)

In January and February of 2014, Plaintiff complained of persistent symptoms of his left leg infection. (*Id.* at 138–40.) On February 20, Plaintiff P.A. Tumada regarding this issue. (*Id.* at 143–45.) Plaintiff complained of pain in his foot, but P.A. Tumada observed no swelling and/or edema and attributed the pain to "degenerative changes" and onycholysis of the toenails.

(*Id*. at 144.) He prescribed "deep-toe" shoes for this issue. (*Id.*) P.A. Tumada also treated Plaintiff's hypertension and added Vasotec to his medications. (*Id.*)

On April 15, 2014 Plaintiff saw Defendant Abdellatif for a chronic care visit. (*Id*. at 148–51.) Plaintiff reported cardiovascular and respiratory issues and symptoms including shortness of breath. (*Id.*) Defendant Abdellatif recorded that Plaintiff's asthma was in "good control" and that his hypertension was in "fair control." (*Id*. at 150.) Abdellatif also noted that "[l]ike usual [Plaintiff] has strange symptoms like 'eye go dead.'" (*Id.*) On July 17, 2014, Defendant Abdellatif again saw Plaintiff for a chronic care visit. (*Id*. at 154–57.) Again, Defendant Abdellatif noted that Plaintiff's asthma was well controlled and that his hypertension was fairly controlled. (*Id.*) He decreased Plaintiff's hypertension medication because Plaintiff reported that it made him tired and achy. (*Id.*)

On September 22, 2014, Plaintiff saw Defendant Abdellatif complaining of an earache. (*Id*. at 160–62.) Both ears were normal upon inspection, and Defendant Abdellatif advised Plaintiff to report to healthcare with any complications. (*Id.*)

On November 17, 2014, Plaintiff again saw Defendant Abdellatif for a chronic care visit. (*Id*. at 166–69.) Plaintiff's blood pressure was 144/77. (*Id*. at 168.) Abdellatif recorded that Plaintiff's heart rate and rhythm were normal and that his lungs were clear with normal respiratory effort. (*Id.*) He concluded that Plaintiff's asthma was well controlled and that his hypertension was "in fair control," and he increased Plaintiff's prescription for Vasotec. (*Id*.)

On January 13, 2015, Defendant Abdellatif approved Plaintiff's request for morning and evening "snack bags" to supplement his diet until he could be seen by the dietician. (*Id*. at 174–75.)

At a chronic care visit on February 26, 2015, Plaintiff presented with cardiovascular and respiratory symptoms. (*Id*. at 178–80.) Defendant Abdellatif observed that Plaintiff's asthma was "in good control" but that Plaintiff used his inhaler more than he should. (*Id.* at 179.) Plaintiff's hypertension was only fairly controlled, but Plaintiff reported that he took only half of his prescribed terazosin. (*Id.*) Defendant Abdellatif advised Plaintiff to take the entire dose of terazosin. (*Id.*)

On May 26, 2015, Plaintiff reported to Defendant Abdellatif for chronic shortness of breath with "no recent changes." (*Id.* at 182–84.) Defendant Abdellatif recorded this issue as "[s]ame old SOB." (*Id.* at 182.) Again, Plaintiff's hypertension was only fairly controlled, and Defendant Abdellatif observed that Plaintiff's "BP [was] slightly high" and decided to change his hypertension medication from Vasotec to Lisinopril. (*Id.* at 184.) Plaintiff also complained of "allergy problems with [a] slew of foods like wheat, sloppy joe, pizza, spaghetti, hamburger, and milk."

On June 1, 2015, Plaintiff fell while using the restroom. (*Id*. at 186–87.) Nurse Herring recorded that Plaintiff believed that his blood pressure had "dropped out" and that it would likely return to normal after he ate breakfast. (*Id.*) After consuming five juice boxes, Plaintiff returned to his housing unit in a wheelchair. (*Id.* at 187.) Nurse Herring contacted Defendant Abdellatif regarding this incident. (*Id.*)

On June 23, 2015, Plaintiff complained to Defendant Abdellatif regarding dizziness and loss of blood pressure when consuming certain foods. (*Id.* at 192–93.) Defendant Abdellatif advised Plaintiff to avoid those foods. (*Id.* at 193.)

On July 9, 2015, Plaintiff reported to healthcare with a reoccurrence of swelling and redness in his left leg. (*Id.* at 199.) According to Nurse Vettriano, Plaintiff stated that the

problem started around midnight the previous evening. (*Id.*) Plaintiff also complained of nausea, difficulty breathing, and vision problems. (*Id.*) Defendant Abdellatif was contacted and prescribed Bactrim and a recheck in two days. (*Id.*)

At his next chronic care visit on August 26, 2015, Plaintiff treated with Defendant Abdellatif for symptoms of hypertension and asthma. (*Id.* at 203–06.) Again, Plaintiff reported taking only half of his hypertension medication. (*Id.*) Defendant Abdellatif concluded that Plaintiff's asthma was in "good control" and that his hypertension was fairly controlled, with the qualification that Plaintiff should take his medication as prescribed. (*Id.*) Plaintiff also complained that he was losing lateral vision in his right eye. (*Id.*) Defendant Abdellatif referred Plaintiff to the Kresge Eye Center to be evaluated for this condition. (*Id.*)

On December 3, 2015, Plaintiff again treated with Defendant Abdellatif for his cardiovascular and respiratory issues. (*Id.* at 207–10.) Plaintiff complained of chest pain and shortness of breath "any time he lay down [*sic*]" which "has been going on for years and years with no recent changes." (*Id.* at 207.) Defendant Abdellatif concluded that Plaintiff's asthma was in "good control" and that his hypertension was in "fair control, close to good control." (*Id.* at 209.) Accordingly, Defendant Abdellatif continued Plaintiff's current medications. (*Id.*)

On January 19, 2016, Plaintiff complained of a rash after eating a turkey or bologna sandwich. (Docket no. 182-1, p. 2.) The nurse contacted Defendant Abdellatif, who prescribed Benadryl. (*Id.*) At the end of the visit, the nurse observed that Plaintiff's arms were "pink instead of red," and that Plaintiff denied shortness of breath and/or difficulty swallowing. (*Id.*) Two days later, the issue remained, and Plaintiff was referred to Defendant Abdellatif for further treatment. (*Id.* at 3–4.) On January 24, Plaintiff complained of lingering symptoms including swelling in his legs. (Docket no. 155, p. 215.) Nurse Martha Rademaker observed that

Plaintiff's blood pressure was low and contacted Defendant Abdellatif, who prescribed IV fluids and ordered a hold on Plaintiff's hypertension medication.  (*Id.*)  At a follow-up appointment the next day, Plaintiff reported feeling better except for the lingering rash and swelling in his legs.  (*Id.* at 217–20.)  Defendant Abdellatif prescribed Bactrim for the rash.  (*Id.* at 219.)  When the issue remained on January 26, 2016, Defendant Abdellatif ordered additional Benadryl.  (Docket no. 182-1, p. 16.)  On January 27, Plaintiff reported to nurse Lisa Adray with high blood pressure and swelling in his legs.  (*Id.* at 20–21.)  She observed that his symptoms were similar to those he experienced due to cellulitis in 2013 and recorded her intention to speak to Plaintiff's doctor the next morning.  (*Id.*)  Defendant Abdellatif reviewed Plaintiff's chart on February 1 and decided to stop the prescription for Bactrim and "see what happens in the next few days." (*Id.* at 23–24.)  On February 3, the prison dietician approved Plaintiff for a low-sodium diet, which would limit his exposure to processed meats.  (*Id.* at 25.)  On March 2, Plaintiff was approved for a vegetarian snack bag to supplement his diet.  (Docket no. 155, p. 234.)

At a chronic care visit on March 9, 2016, Plaintiff complained of shortness of breath, dyspnea with intense exercise and post-nasal drip.  (*Id.* at 228–31.)  Plaintiff's blood pressure was 140/77, leading Defendant Abdellatif to conclude that Plaintiff's hypertension was fairly controlled, even though Plaintiff decided to stop taking Lisinopril due to the side effects.  (*Id.* at 230–31.)  Plaintiff declined substituting a different blood-pressure medication at that time.  (*Id.* at 231.)  His asthma was in good control, but Defendant Abdellatif ordered a chest x-ray "due to complaint of orthopnea and coughing when he lay down [*sic*]."  (*Id.*)  Due to complaints of dizziness caused by low hemoglobin, Defendant Abdellatif extended a detail for Plaintiff to use a wheelchair.  (*Id.*)  The chest x-ray showed "[c]hronic changes . . . represented as flattening of the hemidiaphragms with an increase of the retro sternal clear space."  (*Id.* at 235.)

On March 22, 2016 Plaintiff reported to healthcare complaining that his lower legs and arms were red. (Docket no. 182-1, p. 26.) Nurse Garrett Case instructed him to "fill out a kite for both [a] dietary [consultation] and [a visit to his] M[edical] P[rovider]." (*Id.*) Plaintiff declined to fill out a kite at that time. (*Id.*) On March 28, Plaintiff did consult with the dietician, who removed soy from Plaintiff's diet. (*Id.* at 27.) On March 30, Defendant Abdellatif treated Plaintiff for the rash on his legs. (Docket no. 155, pp. 240–41.) He recorded that the rash had nearly resolved. (*Id.*) This was Defendant Abdellatif's last medical interaction with Plaintiff.

In June of 2016, Plaintiff was transferred to McLaren Hospital with "burning chest pain" symptomatic of a non-ST segment elevation myocardial infarction. (Docket no. 182-1, pp. 37–40.) He was treated with heparin and nitroglycerin and eventually underwent a coronary artery bypass graft. (*Id.*) His doctors noted that "he was previously taking lisinopril up until about one month ago" and that "he was not taking any antihypertensives until [he] was started on enalapril and hydrochlorothiazide within the past week." (*Id.*)

The Court received Plaintiff's complaint on August 10, 2016. (Docket no. 1.) Plaintiff asserts that he mailed the complaint on August 1, 2016. (Docket no. 200, p. 33.) Plaintiff amended his complaint on September 9, 2016. (Docket no. 13.)

On May 22, 2017, the Court dismissed Plaintiff's claims against Defendants Bobby Echols and Charles Allen, which were based on the denial of dental care. (Docket no 82, p. 2.) On August 3, 2018, the Court dismissed all claims arising at the Kinross and Mound correctional facilities, dismissed all claims against Corizon Health, Inc., Prison Health Services and Correctional Medical Services, dismissed all claims under the Fourteenth Amendment, First Amendment and RICO act, and dismissed all claims against the MDOC defendants in their

official capacities, except as to any of Plaintiff's allegations seeking non-frivolous prospective injunctive relief.  (Docket no. 128.)

On January 1, 2019, the remaining Corizon Defendants filed a motion for summary judgment.  (Docket no. 153.)  On February 15, 2019, the remaining MDOC Defendants filed a motion for summary judgment.  (Docket no. 173.)  Plaintiff responded to the Corizon Defendants' motion (*see* docket no. 200) and to the MDOC Defendants' motion (docket no. 218).

> ## B.    Standard of Review

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docket no. 10).  Summary judgment is appropriate where the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 915 (6th Cir. 2000).  Rule 56 provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

Once the moving party has met its burden of production, the non-moving party must come forward with significant probative evidence showing that a genuine issue exists for trial.

*Covington*, 205 F.3d at 915.  A mere scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment; rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Ultimately, a district court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)*; Hager v. Pike County Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

In responding to a motion for summary judgment based on failure to exhaust available administrative remedies, it is not the prisoner's burden to plead or prove that he has successfully done so.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007).  Rather, failure to exhaust administrative remedies is an affirmative defense, *Jones*, 549 U.S. at 216, and the defendant carries the burden of persuasion on the issue, *Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012).  "In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's 'initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'"  *Surles*, 678 F.3d at 455–56 (quoting *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)).  In such cases, "[s]ummary judgment is appropriate only if defendants establish the absence of a 'genuine dispute as to any material fact' regarding non-exhaustion."  *Id.* (citing *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)).

C.    **Analysis**

       1.    *Corizon Defendants' Motion for Summary Judgment*

         a. Exhaustion

The Corizon Defendants contend that Plaintiff failed to exhaust his administrative remedies for all claims against Defendant Geml.  (Docket no. 153, pp. 28–29.)

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust all administrative remedies before filing a Section 1983 action.  Specifically, the statute provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory and requires a prisoner to comply with state procedural rules such as time limits for filing grievances and other critical procedural rules.  *Jones v. Bock*, 549 U.S. 199, 211 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).  "[P]roper exhaustion of administrative remedies . . . means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."  *Woodford*, 548 U.S. at 90" (citation omitted).

The MDOC's administrative policies state that complaints filed by prisoners "serve to exhaust a prisoner's administrative remedies only when filed as a grievance through all three steps of the grievance process in compliance with this policy."   MDOC Policy Directive 03.02.130(B).   The grievance procedure outlined in Policy Directive 03.02.130 applies to complaints of "Prohibited Sexual Conduct Involving Prisoners" as described by Policy Directive 03.03.140. *Id.*

A prisoner must file a Step I grievance within five days of attempting to informally resolve the grievable issue with prison staff.  MDOC Policy Directive 03.02.130(V).  If the prisoner is dissatisfied with the Step I response, or if he did not receive a timely response, he may file an appeal, referred to as a Step II grievance.  MDOC Policy Directive 03.02.130(BB). If a prisoner is dissatisfied with the Step II response, the prisoner "must send a completed Step III grievance . . . to the Grievance and Appeals Section within ten business days after receiving the Step II response or, if no response was received, within ten business days after the date the response was due . . . ."  MDOC Policy Directive 03.02.130(FF).  A prisoner's administrative remedies are exhausted once his complaints have been grieved "through all three steps of the grievance process in compliance with [the] policy."  MDOC Policy Directive 03.02.130(B). "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing."  MDOC Policy Directive 03.02.130(S).

Defendants refer to four grievances that were not properly exhausted prior to the date of Plaintiff's amended complaint (MRF-2013-02-0166-28C, MRF-2016-07-1371-28i, MRF-2016-07-1370-28i, RGC-2016-07-005220-12D), as well as two grievances mentioning Defendant Geml that do not concern the claims at issue in this case (MRF-2013-02-0194-28E, MRF-2013-02-0238-27Z).  (*See* docket no. 153-6.)  In response, Plaintiff contends that MRF-2013-02-0166-28C ("Grievance 166") was improperly denied on procedural grounds and that MRF-2016-07-1371-28i ("Grievance 1371") and MRF-2016-07-1370-28i ("Grievance 1370") were properly exhausted.  (Docket no. 200, pp. 29–32.)

In Grievance 166, Plaintiff alleged that on January 23, 2013, a nurse observed his temperature to be 100 degrees and his blood pressure to be 198/90 and failed to send him to

urgent care.  (Docket no. 180, p. 69.)  Plaintiff also contended that Defendant Geml, along with eleven other medical providers, was "denying care to [him] for cause of recurring pneumonia." (*Id.*)  In addition, Plaintiff contended that Corizon was committing genocide by treating based on cost "rather than cur[ing] the disease."  (*Id*.)  Grievance Coordinator Taylor rejected this grievance for containing multiple issues in violation of MDOC Policy Directive 03.02.130.  (*Id.* at 70.)  That determination was upheld at Step III on August 30, 2013.  (*Id.* at 72.)

As described above, Grievance 166 does in fact contain multiple issues.  But more importantly for present purposes, Defendant Geml did not treat Plaintiff on January 23, 2013, the incident date alleged in Grievance 166.  (*See* docket no. 155, pp. 32–33.)  Plaintiff's medical records suggest that Defendant Geml had not treated Plaintiff since November of 2012.  (*See id.* at 21.)  Accordingly, Grievance 166 did not properly exhaust any claims against Defendant Geml.

Grievance 1370 and Grievance 1371 both were filed on July 25, 2016.  (Docket no. 180-2, pp. 27, 32.)  The MDOC mailed Step III responses on November 9, 2016.  (*Id*. at 31, 36.)  Accordingly, neither grievance was exhausted before Plaintiff filed his amended complaint on September 9, 2016.  (*See* docket no. 13.)

For the above reasons, the Court should find that Plaintiff has failed to exhaust any claims in his amended complaint against Defendant Geml and grant summary judgment in favor of Defendant Geml.

b.  Deliberate Indifference

Plaintiff alleges that the Corizon Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  (Docket no. 200, pp. 36–52.)

The Eighth Amendment provides an inmate the right to be free from cruel and unusual punishment. "[A] prisoner's Eighth Amendment right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). An Eighth Amendment claim on these grounds is comprised of an objective and a subjective component. *Clark–Murphy v. Foreback*, 439 F.3d 280, 292 (6th Cir. 2006).

The objective component requires the plaintiff to show that the medical need at issue is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)); *see also Friend v. Rees*, 779 F.2d 50, 1985 WL 13825, at *3 (6th Cir. Oct.1, 1985)).

The subjective component requires a showing that the "official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Express intent to inflict unnecessary pain is not required, but "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Richmond v. Huq*, 885 F.3d 928, 939 (6th Cir. 2018) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1976); *Farmer*, 511 U.S. at 838).

Courts are "generally reluctant to second guess medical judgments." *Asplaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.

5 (6th Cir. 1976)).  *See also Comstock*, 273 F.3d at 703 ("The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims.").   Nevertheless, treatment may be constitutionally impermissible when it is "so woefully inadequate as to amount to no treatment at all."  *Id.*

Below, the undersigned will analyze Plaintiff's deliberate indifference claims against Defendants Abdellatif and Bashir.

### i. Against Defendant Abdellatif

As summarized in the background section, Plaintiff treated with Defendant Abdellatif on at least fifteen occasions between December of 2012 and March of 2016.

Plaintiff alleges that Defendant Abdellatif acted with deliberate indifference when Plaintiff complained of: (1) respiratory ailments such as coughing and shortness of breath; (2) high and low blood pressure; (3) swelling in his legs; (4) food allergies; and (5) skin irregularities suspected to be cancerous.  (Docket no. 200, pp. 7–21.)

As discussed above, Plaintiff's medical records show that Defendant Abdellatif treated these complaints or determined that they were not medically significant.  Treatment of Plaintiff's respiratory issues included "peak-flow" examinations, chest x-rays, nebulizer therapy and prescription of inhalers.  Treatment of Plaintiff's hypertension included medication (with regular modifications) and dietary recommendations.  Defendant Abdellatif also prescribed antibiotics for bacterial infections.

Plaintiff also alleges that Defendant Abdellatif failed to diagnose an ear infection and failed to test for various food and airborne allergies.  (Docket no. 182, p. 8.)  But the records suggest that Defendant Abdellatif evaluated these complaints and concluded that they were not

18

medically serious.  Defendant Abdellatif noted that Plaintiff reported that he was allergic to wheat, cocoa butter lotions, sloppy joes, pizza, spaghetti, hamburger, milk and soy.  He advised Plaintiff to avoid those foods and referred him to the prison dietician.  Defendant Abdellatif inspected Plaintiff's ears during a visit on September 22, 2014 and observed that both were "unremarkable to inspection" with "normal tympanic membrane(s)."  (Docket no. 155, p. 2332.)

On review of the record, no reasonable jury could find that Defendant Abdellatif acted with deliberate indifference to Plaintiff's serious medical needs.  As described above, Defendant Abdellatif rendered substantial treatment to Plaintiff. The conservative nature of the treatment does not make it indifference.  Moreover, no reasonable factfinder could attribute Plaintiff's June 2016 heart attack to indifference on the part of Defendant Abdellatif.  In March of 2016, Defendant Abdellatif observed that Plaintiff voluntarily ceased taking Lisinopril for high blood pressure and declined to be prescribed a replacement medication.  (Docket no. 155, pp. 230–31.) When Plaintiff last treated with Defendant Abdellatif on March 30, 2016, his blood pressure was 145/72, not markedly different than it had been over Plaintiff's course of treatment.  (*Id.* at 240.) Given the substantial treatment rendered, to analyze whether Defendant Abdellatif should have done more to prevent the heart attack would require the Court to second guess a medical judgment.  *C.f.*, *Asplaugh*, 643 F.3d at 169.

## ii. Against Defendant Bashir

As summarized above, Plaintiff treated with Defendant Bashir in September of 2013 at Duane Walters Health Center ("DWH") in Jackson, Michigan.  Plaintiff alleges that Defendant Abdellatif acted with deliberate indifference to his medical needs by failing to treat: (1) an ear infection; (2) "curable Heart Failure"; and (3) a lower leg infection and swelling.  (Docket no. 182, pp. 23–26.)

On September 10, 2013, Defendant Bashir observed that Plaintiff's left leg was swollen. (Docket no. 155, p. 84.)  He noted that Plaintiff had been diagnosed with cellulitis starting in his toes, and was experiencing a "possible recurrence" of the infection after being off antibiotics for ten days.  (*Id.* at 85.)  He prescribed Bactrim and instructed Plaintiff to keep his leg elevated while sitting and to increase ambulation.  (*Id.*)  Nine days later, Nurse Renee Hendrick observed that Plaintiff's leg infection was "stable and improved" and that Plaintiff "remain[ed] able to perform ADLs independently."  (*Id.* at 88.)  Accordingly, Plaintiff was transferred from DWH back to MRF.  (*Id.*)

Nothing in this brief course of treatment suggests that Defendant Bashir acted with deliberate indifference to Plaintiff's medical needs.  Plaintiff contends that his leg condition was not "stable and improved" when he was discharged from DWH on September 19, 2013 but was actually a symptom of Plaintiff's heart condition that did not resolve until his June 2016 coronary bypass surgery.  (Docket no. 182, pp. 24–25.)  But regardless of the eventual diagnosis, there is no basis to conclude that Defendant Bashir ignored the issue.  To the contrary, he prescribed antibiotics.  When another medical professional, Nurse Hendrick, observed that the condition had improved with antibiotics, Plaintiff was discharged from DWH.  To analyze whether Defendant Bashir should have treated Plaintiff's leg swelling differently would require the Court to second guess a medical judgment.  *C.f.*, *Asplaugh*, 643 F.3d at 169

As to the issues that Defendant Bashir allegedly did not treat, the record suggests that he did not perceive these issues to be serious medical concerns in need of treatment.  During the September 10 examination, Defendant Bashir recorded that Plaintiff's blood pressure was 131/79 and that his lungs sounded clear with normal respiratory effort.  (Docket no. 155, p. 84.) Plaintiff alleges that Defendant Bashir failed to take reported symptoms seriously and instead

told Plaintiff that he "think[s] too much."  But this comment tends to reinforce the conclusion that Defendant Bashir did not subjectively observe medically serious impairments other than the lower-leg swelling.  *C.f.*, *Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Accordingly, the Court should grant summary judgment in favor of Defendants Abdellatif and Bashir.

3.     *MDOC Defendants' Motion for Summary Judgment*

a.  Defendants in Supervisory Roles

The MDOC Defendants contend that the Court should grant summary judgment in favor of Defendant Stieve, Defendant Kirstein, Defendant Washington and Defendant Heyns because those individuals "had no personal involvement in Plaintiff's medical care."  (Docket no. 173, p. 9.)  Defendants Stieve and Kirstein were, at times relevant to Plaintiff's complaint, employed as Chief Medical Officer for the MDOC.  (*Id.* at 12.)  Defendants Washington and Heyns served as directors of the MDOC.  (*Id.* at 14.)

To prevail on a § 1983 claim, a plaintiff must show that the defendant was "personally involved" in the alleged unconstitutional conduct and/or that the defendant "encouraged or condoned others in doing so."  *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 376, 96 S. Ct. 598, 606, 46 L. Ed. 2d 561 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).

Plaintiff asserts that Defendants Kirstein and Steive maintained MDOC policies that precluded his doctors from treating "hypotensive emergencies" and "the hyperlipidemia that caused Plaintiff to have multiple heart attacks and injury in June 2016."  (Docket no. 218, pp.

21

15–16.)  Plaintiff further contends that Defendant Kirstein "failed to permanently prescribe protective lenses" to accommodate Plaintiff's retinopathy.  (*Id.* at 18.)  None of these claims appear in any concrete form in Plaintiff's amended complaint.  (*See generally* docket no. 13.)  The Court should not consider new claims at the summary-judgment stage.  *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.") (citing Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)).

Nevertheless, the record reflects that Plaintiff received treatment for hyperlipidemia (docket no. 181, p. 7 (Plaintiff states that his doctors gave him "useless cholesterol medications for hyperlipidemia caused by Celiac disease"); docket no. 182-1, p. 82 (Plaintiff's cholesterol within normal range on January 24, 2016)) and hypotension (docket no. 155, pp. 186–87 (Plaintiff directed to increase fluids); *id.* at 215 (Plaintiff's blood-pressure medication altered); *id.* at 248 (Plaintiff scheduled for biweekly vital-sign monitoring due to hypotensive fluctuations)).  In addition, Defendant Kirstein approved tinted lenses for one year beginning on December 11, 2015.  (Docket no. 218, p. 40.)  Based on the record before the court, Defendants Kirstein and Stieve did not act with deliberate indifference to Plaintiff's medical needs.

Plaintiff does not attempt to buttress his claims against Defendants Washington and Heyns, and the record does not reflect that either individual was personally involved in Plaintiff's medical care.

Accordingly, the Court should dismiss the claims against Defendants Kirstein, Stieve, Washington and Heyns, in both their individual and official capacities.

22

b. <u>Defendant Adray</u>

The MDOC Defendants contend that Defendant Adray did not act with deliberate indifference to Plaintiff's medical needs.  (Docket no. 173, pp. 21–22.)  Plaintiff alleges that Defendant Adray acted with deliberate indifference on eight occasions between June of 2012 and August of 2016.  (Docket no. 218, pp. 21–23.)

Plaintiff alleges that on June 30, 2012, Defendant Adray refused to treat him for heatstroke.  (*Id.* at 21.)  This incident falls outside of the three-year statute of limitations for deliberate indifference claims.  (*See* discussion of limitations period in December 1, 2017 Report and Recommendation regarding Defendants' motions to dismiss, docket no. 112.)

Plaintiff alleges that on October 29, 2013, Defendant Adray refused to treat him for hives that covered his body.  (Docket no. 218, p. 21.)  These allegations most closely correspond to Grievance no. MRF-13-11-1098-28b.  (Docket no. 181, pp. 29–36.)  In that grievance, Plaintiff alleged that on October 24, 2013, Defendant Adray refused to document Plaintiff's allergies because he did not have hives when she examined him.  (*Id.* at 32.)  Plaintiff also alleged that on October 26, three different nurses failed to document that he had hives and/or to treat him for that condition.  (*Id.* at 30, 32.)  According to the terms of this grievance, therefore, Defendant Adray simply declined to document a symptom that she did not observe.  No reasonable factfinder could determine that this allegation amounts to deliberate indifference.

Plaintiff contends that on August 14, 2014, Defendant Adray "threatened and intimidated Plaintiff for the exercise of his First Amendment right in asserting medical issues proscribed by the Eighth Amendment."  (Docket no. 218, p. 22.)  This claim does not allege deliberate indifference of a serious medical need.  The Court dismissed Plaintiff's First Amendment claims in an Order dated August 3, 2018.  (Docket no. 128, p. 30.)

Plaintiff asserts that on May 29, 2015, Defendant Adray "refused to inform the Plaintiff what his medical record said was the cause of his lower leg edema."  (Docket no. 218, p. 22.)  This contention does not support a deliberate indifference claim.  Plaintiff has shown the ability to obtain and review his medical records.

Plaintiff contends that on July 9, 2015, Defendant Adray denied him treatment for an infection in his left leg.  (*Id.*)  This allegation corresponds to Grievance no. MRF 15-07-1270-12E.  (Docket no. 180-1, pp. 85–90.)  In that grievance, Plaintiff contended that Defendant Adray refused to admit him to the healthcare unit for treatment of an infection in his leg that "ran up the inside of [his] groin" and was "beginning to infect [his] left lung and sinus."  (*Id.* at 85.)

In response to the grievance, prison officials documented that Plaintiff began complaining of the infection at approximately 1:30 a.m. on July 9.  (*Id.* at 86.)  Around that time, an unidentified individual in the health unit responded that Plaintiff could not be seen until the next day.  (*Id.*)  At approximately 6:00 a.m. on July 9 Defendant Adray stated that she would call-out Plaintiff when the doctor arrived.  (*Id.*)  Plaintiff was not seen in the health unit until approximately 6:30 p.m. that day, when Nurse Angela Vettriano monitored his vital signs, contacted Defendant Abdellatif, and administered an oral antibiotic.  (Docket no. 155, p. 199.)

As set forth above, a deliberate indifference claim requires the plaintiff to show that the medical need at issue is "sufficiently serious."  *Farmer*, 511 U.S. at 834.  Where a medical condition does not obviously require prompt medical attention (*see Blackmore v. Kalamazoo Cty.*, 390 F.3d at 897), Plaintiff can meet the objective component by presenting "verifying medical evidence [of] the detrimental effect of the delay in medical treatment."  *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

24

The record in this case shows that Defendant Adray delayed treatment until Plaintiff could be seen by a doctor.  When no doctor became available within a reasonable amount of time (approximately 6:30 p.m. on the day that Plaintiff presented the issue), Nurse Vettriano treated Plaintiff and contacted Defendant Abdellatif, apparently by phone.  Defendant Abdellatif prescribed an oral antibiotic.  Two days later, Plaintiff's leg "remain[ed] red in color" but was "less red than [on July 9]."  (Docket no. 182, p. 95.)  This evidence shows no detrimental effect caused by the delay in treatment from 1:30 a.m., the earliest Defendant Adray could have known of the issue, to 6:30 p.m., when Plaintiff ultimately received treatment.  Accordingly, the Court should find that the July 9 leg infection does not rise to the level of a "sufficiently serious" medical need for the purposes of the Eighth Amendment.

Plaintiff alleges that on March 9, 2016, Defendant Adray "refused to make a referral to Dr. Abdellatif for continuing rash and treatment."  (Docket no. 218, p. 22.)  Plaintiff did in fact see Defendant Abdellatif on that date (docket no. 155, pp. 228–31), and Plaintiff's grievance arising from that date does not list Defendant Adray as being involved.  (Docket no. 181-1, p. 9.)

Plaintiff contends that Defendant Adray again denied treatment on March 20, 2016. (Docket no 218, p. 22.)  In the grievance that corresponds with this date (MRF-16-03-6350-12E), Plaintiff alleged that Defendant Adray delayed and/or denied care for a "rash and open running sores on [his] appendages."  (Docket no. 180-2, p. 12.)  In response to this grievance, prison officials observed that neither the housing unit logbook nor the health unit logbook reflected that Plaintiff requested care on March 20 or March 21.  (*Id.* at 13.)  On March 22, 2016, Plaintiff reported to healthcare complaining that his lower legs and arms were red.  (Docket no. 182-1, p. 26.)  Nurse Garrett Case instructed him to "fill out a kite for both [a] dietary [consultation] and [a visit to his] M[edical] P[rovider]."  (*Id.*)  Plaintiff declined to fill out a kite at that time.  (*Id.*)  On

25

March 28, Plaintiff did consult with the dietician, who removed soy from Plaintiff's diet.  (*Id.* at 27.)  On March 30, Defendant Abdellatif treated Plaintiff for the rash on his legs.  (Docket no. 155, pp. 240–41.)  He recorded that the rash had nearly resolved.  (*Id.*)  Based on this evidence, no reasonable juror could find that Defendant Adray acted with deliberate indifference to a serious medical need on March 20, 2016.

Plaintiff asserts that on March 30, 2016, Defendant Adray refused to document Plaintiff's food allergies.  (Docket no. 218, p. 23.)  In the grievance that corresponds to this issue (MRF-16-04-7340-28c), Plaintiff contended that Defendant Adray would not enter into his medical records that he was allergic to processed meats and soy.  (Docket no. 181-1, p. 14.)  But Plaintiff offers no authority supporting his claim that Defendant Adray had a duty to record all self-reported maladies.  By March 30, 2016, Plaintiff had consulted on multiple occasions with the prison dietician, who approved Plaintiff for a low-sodium diet, which would limit his exposure to processed meats.  (*Id.* at 25.)  The dietician also removed soy from Plaintiff's diet (*id.* at 27) and supplemented Plaintiff's diet with a vegetarian snack bag (docket no. 155, p. 234).  Based on the record, the Court should determine that Defendant Adray did not act with deliberate indifference to a serious medical need on March 30, 2016.

Plaintiff alleges that on August 3, 2016, Defendant Adray "committed criminal medical fraud by saying no medical holds were/are on me and saying I did not require [a] special diet." (Docket no. 180-2, p. 41.)  Plaintiff contends that this resulted in deep-vein thrombosis and pulmonary emboli during his transfer from MRF to DRF.  (Docket no. 218, p. 23.)  In response to the grievance arising from this issue (MRF 16-08-1546-12Z), prison officials determined that at the time of Plaintiff's transfer from MRF Plaintiff "did not have any active medical holds" and that his "prescribed diet can be fulfilled at any facility."  (Docket no. 180-2, p. 42.)  Plaintiff

presents no evidence to the contrary.  Accordingly, the Court should find that Defendant Adray did not act with deliberate indifference to a serious medical need on August 3, 2016.

c. <u>Defendant Taylor</u>

The MDOC Defendants move for summary judgment of the claims against Defendant Taylor, asserting that "Defendant Taylor's actions as grievance counselor were conducted according to policy."  (Docket no. 173, p. 22.)

In response Plaintiff contends that Defendant Taylor improperly rejected several of his grievances.  (Docket no. 218, pp. 18–19.)  These claims are grounded in the free speech clause of the First Amendment and/or the due process clause of the Fourteenth Amendment.  The Court dismissed Plaintiff's First Amendment claims and Fourteenth Amendment claims in an Order dated August 3, 2018.  (Docket no. 128, p. 30.)  Accordingly, the Court should grant summary judgment in favor of Defendant Taylor.

**C.     Conclusion**

For the reasons stated herein, the undersigned recommends that Defendants' motions for summary judgment (docket no. 153; docket no. 173) be **GRANTED** and that Plaintiff's claims be dismissed.

**III.    NOTICE TO PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Eastern District of Michigan Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *U.S. v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  Filing of objections which

raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


Dated: August 16, 2019          s/ Mona K. Majzoub
                                MONA K. MAJZOUB
                                UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Plaintiff and counsel of record on this date.

Dated: August 16, 2019          s/ Leanne Hosking
                                Case Manager